IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTOINETTE SUCHENKO and LISA
GATHERS,

                    Plaintiffs,

          v.

PURPLE INNOVATION, LLC, d/b/a PURPLE,


                    Defendant.

Civil Action No.   2:18-962

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Antoinette Suchenko and Lisa Gathers ("Plaintiffs"), by and through undersigned counsel,

seek a permanent injunction requiring a change in Purple Innovation, LLC's ("Defendant" or

"Purple") corporate policies to cause its website to become, and remain, accessible to individuals

with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

Equal opportunity for the disadvantaged—so far as practicable—has been a major
goal of the United States since World War II. This case deals with one aspect of
that struggle—providing the visually impaired with an effective opportunity to use
the internet for procuring consumer products…The blind, like the deaf, can,
demonstrations during the present litigation have shown, achieve high internet
communication skills if they are trained and have appropriate cooperation from
merchants in providing the proper technology and software.

*Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *1 (E.D.N.Y. Dec. 21,

2017) (J. Weinstein).

1.      Antoinette Suchenko has been legally blind since undergoing retina surgery more

than 20 years ago. Today, she uses a screen reader to navigate the Internet.

2.      Lisa Gathers was born with a degenerative retina disease. She lost her vision when she was just nineteen and is now totally blind. She too uses a screen reader to navigate the Internet.

3.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Id.* at *6. Specifically,

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.* at *6-7.[1]

4.      Purple is a retailer of comfort products, including mattresses, pillows, sheets, mattress protectors, seat cushions, power and platform bases, and pet beds.[2]

5.      Purple sells its comfort products in various retail stores across the United States, like Mattress Firm[3] and Sam's Club,[4] at its brick-and-mortar showroom in Alpine, UT, and direct-to-consumers at www.purple.com ("Website"), a website the Purple owns, operates, and controls.[5]

---

[1]      For additional information on screen reader technology, visit American Federation for the Blind at http://www.afb.org/prodBrowseCatResults.aspx?CatID=49 (last accessed July 11, 2018).

[2]      *See* https://purple.com/ (last accessed July 10, 2018).

[3]      *See* https://www.mattressfirm.com/mattresses/purple/ (last accessed July 10, 2018).

[4]      *See* https://www.samsclub.com/sams/search/searchResults.jsp?searchTerm=purple&searchCategoryId=all&xid=hdr_search-typeahead_purple (last accessed July 10, 2018).

[5]      *See*  https://purple.com/terms-and-privacy  (last accessed July 9, 2018)

6.      Purple's Website allows consumers to research and purchase Purple's products from the comfort and convenience of their own homes, chat with a customer service representative using the Website's Live Chat plugin, locate Purple's brick-and-mortar showroom and its Showroom Hours, review important legal notices like Purple's Privacy Policy and Terms and Conditions of Use, and more.

7.      Purple is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

8.      Unfortunately, Purple denies approximately 7 million[6] Americans who are visually impaired access to its Website's goods, content, and services because the Website is largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world.

9.      Plaintiffs bring this civil rights action against Purple to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted

---

[6]      Perkins School of the Blind (Watertown, MA), *America's Blind Spot: What's Preventing Us From Including Those Who Are Blind in the Sighted World?*, p. 5, *available at* http://www.perkins.org/sites/default/files/perkins-americas-blind-spot-ebook.pdf (last accessed July 10, 2018).

individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10.    By failing to make its Website available in a manner compatible with computer screen reader programs, Purple, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11.    Because Purple's Website has never been accessible and because Purple does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Website to become and remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring:

   a)  that Purple retain a qualified consultant acceptable to Plaintiffs ("Web Accessibility Consultant") who shall assist it in improving the accessibility of its Website, including third party content and plug-ins, so the goods and services on the Website may be equally accessed and enjoyed by individuals with vision related disabilities;

   b)  that Purple work with the Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

   c)  that Purple work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Purple's Website may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

   d)  that Purple work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

   e)  that Purple incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f)  that Purple work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Website, along with an e-mail address and toll free phone number to report accessibility-related problems;

g)  that Purple directly link from the footer on each page of the Website, a statement that indicates that Purple is making efforts to maintain and increase the accessibility of its Website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Purple through the Website;

h)  that Purple accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)  that Purple provide a notice, prominently and directly linked from the footer on each page of the Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  that Purple provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website;

k)  that Purple train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Purple shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Purple shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)  that Purple modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology;

m)  that Plaintiffs, their counsel and its experts monitor the Website for up to two years after the Mutually Agreed Upon Consultant validates the Website is free of accessibility errors/violations to ensure Purple has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and its experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Purple.

12.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

13.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14.     Purple attempts to, and indeed does so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Purple enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Purple's knowing and repeated transmission of computer files over the Internet. Purple also relies on brick-and-mortar distributors, like Mattress Firm in The Waterfront[7] and Sam's Club off Mt. Nebo Rd.[8] to sell its products in this jurisdiction. *See Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (exercising personal jurisdiction over forum-based plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 2018 WL 1440315 (D. Mass. Mar. 22, 2018) (same).

---

[7]     74 E Waterfront Dr, Homestead, PA 15120
[8]     289 Mt Nebo Pointe Dr, Pittsburgh, PA 15237

15.     As described in additional detail below, Plaintiffs were injured when they attempted to access Purple's website from their homes in Allegheny County, Pennsylvania and New Bedford, Massachusetts, but encountered barriers that denied them full and equal access to Purple's online goods, content, and services.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff Suchenko's claims occurred.

## PARTIES

17.     Plaintiff Suchenko is and, at all times relevant hereto, has been a resident of Allegheny County, Pennsylvania. Plaintiff Suchenko is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

18.     Plaintiff Gathers is and, at all times relevant hereto, has been a resident of Massachusetts. Plaintiff Gathers is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

19.     Purple is a Delaware Limited Liability Corporation with its principle place of business at 123 East 200 North, Alpine, Utah 84004. Purple's Website is a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

## FACTS APPLICABLE TO ALL CLAIMS

20.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement

digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

### PURPLE'S ONLINE CONTENT

21.     Purple's Website allows consumers research and purchase Purple's products from the comfort and convenience of their own homes and arrange for home delivery.

22.     The Website also enables consumers to chat with a customer service representative using the Website's Live Chat plugin, locate Purple's brick-and-mortar showroom, and determine the hours which Purple's Showroom is open to the public.

23.     Purple's Website also provides consumers with access to important legal information, including Purple's Privacy Policy and Terms and Conditions of Use.

24.     Consumers may use the Website to connect with Purple on social media, using sites like Facebook, Twitter, and Instagram.

### PURPLE'S BRICK-AND-MORTAR SHOWROOM

25.     Purple owns and operates a brick-and-mortar showroom in Alpine, UT ("Showroom").

26.     Purple's Showroom is open to the public six days a week.

27.     Consumers may access Purple's Showroom from 10:00 a.m. to 6:30 p.m. MST from Monday through Friday, and from 10:00 a.m. to 3:30 p.m. MST on Saturday.

28.     Purple's Website invites consumers to visit its Showroom during normal Showroom Hours.[9]

---

[9]      *See* https://purple.com/support (last accessed July 11, 2018).

Customer Service Hours:
Mon – Fri 8 AM – 7 PM MST
Sat 10 AM – 4 PM MST

Returns Department Hours:
Mon – Fri 8 AM – 4:30 PM MST

Alpine, Utah Showroom Address:
123 East 200 North, Alpine, UT 84004
(east side of the building)

Alpine, Utah Showroom Hours:
Mon – Fri: 10 AM – 6:30 PM MST
Sat: 10 AM – 3:30 PM MST

29.    Purple's employees also solicit consumers to its Showroom.[10]

**Abbie Hansen**

Can I pick up a King Platform base at the Alipine location?

 3    

**Ruthie Dangerfield**
6 months ago

Hey, the only things we sell in our showroom at Purple are the seat cushions. Everything else will need to be shipped! Come see us to try out our incredible Purple® Mattress and products! See you in Alpine soon!

 8    

30.    Consumers visit the Showroom to test and purchase Purple's products.

---

[10]    Ruthie Dangerfield works in Purple's Showroom. *See* https://www.linkedin.com/in/ruthie-dangerfield-92173420/ (last accessed July 11, 2018).



**Shaherizad Parse**
Local Guide · 4 reviews

 a year ago - 🏳

We're from Montana and are only in town for a few days, so my mother didn't understand why I was wasting an entire afternoon driving her out into rural Utah just to look at a mattress. However, after seeing and trying out the Purple mattress, she no longer feels the afternoon was wasted.

We had no trouble finding the showroom, and it didn't seem like anyone had trouble either, since it was packed with customers by the time we left.
I appreciated the no pressure sales approach, but had hoped for a little more information than we received, since my mother had never seen a Purple advertisement and I couldn't remember everything from the one I'd seen 7 months ago. (Perhaps some detailed flyers about Purple, with product names and price lists would be helpful, since there were far more customers than sales staff.)

We still left with a pillow, a seat cushion, and a handful of "squishy" samples for friends, and we will probably both be ordering new Purple mattresses in the near future!



**Brandon Buchanan**
Local Guide · 168 reviews · 129 photos

★★★★★ 4 months ago

The showroom is really small, but It was nice to be able to test the mattresses out.  The women who helped us was very friendly and helpful.



**Scott Hansen**
Local Guide · 9 reviews · 311 photos

★★★★★ a year ago

I went to the showroom to try out the mattress and get a feel for their product. Jessie  was extremely helpful and answered every question I had. For some of the more detailed information she was happy to look up everything I needed to know about dimensions, etc.  excellent customer service. You can tell the employees enjoy working here and truly believe in their product



**Caleb Carr**
7 reviews

★★★★★ 10 months ago

The lady working the showroom was very friendly, and answered all of my questions. The beds, pillows, and seats felt amazing. You won't regret stopping by.

## HARM TO PLAINTIFFS

31.    Plaintiff Suchenko attempted to access the Website from her home in Allegheny County, Pennsylvania with JAWS 2018 Screen Reading Software, the same screen reader program she normally uses to browse the Internet.[11]

32.    "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC."[12]

33.    Unfortunately, because of Purple's failure to build its Website in a matter that is compatible with screen reader programs, Plaintiff Suchenko is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Website. For example:

(a)  Plaintiff Suchenko was unable to access the Website's shopping cart after activating the "Add to Cart" button. Instead, her screen reader continued to read the text and content below this "Add to Cart" button. As a result, she could not determine how to complete the checkout process and was blocked from purchasing Purple's products.

(b)  Plaintiff Suchenko encountered multiple items on the Website that lack sufficiently descriptive text equivalents for non-text elements. Providing alternative text equivalents allows information to be rendered in a variety of ways by a variety of users, including Plaintiffs. A person who cannot see a picture or image file can have a text alternative read aloud using synthesized

---

[11]    For more information on JAWS 2018, visit https://www.freedomscientific.com/downloads/JAWS/JAWSWhatsNew (last accessed July 11, 2018).
[12]    *See* https://www.freedomscientific.com/products/blindness/jawsdocumentation (last accessed July 11, 2018).

speech describing the picture's content. For example, the Website includes an infographic describing all of the reasons why consumers, like Plaintiff Suchenko, should "get psyched" about Purple's mattresses, including the fact they are recyclable, antimicrobial, food grade, non-toxic, hypoallergenic, and are "placed on top of two CertiPUR-®US Certified layers of polyurethane foam using a smart-comfort grid system that ensures a soft feel while you still get all the support you need when sleeping."[13]



Unfortunately, Purple's Website does not communicate this information in an accessible alternative, thus preventing Plaintiff Suchenko from performing the same research Purple affords consumers who do not suffer a visual disability.

34.     Plaintiff Gathers attempted to access the Website from her home in Massachusetts with Voiceover, the same screen reader program she normally uses to browse the Internet.

35.     VoiceOver is "a full-featured screen reader built into macOS that speaks the text in documents and windows, and describes aloud what appears on your screen…With VoiceOver, you control your Mac primarily with a keyboard, refreshable braille display, or trackpad. You use the

---

[13]     *See* https://purple.com/mattresses/compare (last accessed July 11, 2018).

VoiceOver cursor—which appears as a dark rectangular outline—to move around the screen, select buttons and other controls, and to read and edit text."[14]



36.    Unfortunately, because of Purple's failure to build its Website in a matter that is compatible with screen reader programs, Plaintiff Gathers is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Website. For example:

(a) After adding an item to her shopping cart, Purple's Website prompted Plaintiff Gathers to "pick one free gift." Unfortunately, Plaintiff Gathers could not access the pop-up window in which the "free gifts" appeared with Voiceover, and as a result, was denied the opportunity to choose from Purple's sheets, pillows, mattress protectors, and seat cushion.



---

[14]    For more information, *see* https://help.apple.com/voiceover/info/guide/10.12/#/vo2681 (last accessed June 6, 2018).

(b) Plaintiff Gathers encountered items on Purple's Website that were listed at two different prices, leaving her confused as to what price Purple would charge her upon completing the checkout process. Individuals who do not suffer a visual disability perceive that one price, which appears in ~~strikethrough~~ font, is the "original" price, and the other, lower price, which does not appear in strikethrough font, is the "discount" price. Unfortunately, screen readers do not perceive the meanings represented by these two fonts, leaving Plaintiff and other individuals who use screen readers unable to recognize these discounts, or simply ascertain the correct purchase price.



(c) Plaintiff Gathers also encountered multiple items on the Website that lack sufficiently descriptive text equivalents for non-text elements. For example, the Website includes various five-star reviews from "customers who are seeing REAL benefits from Purple." The Website communicates these customer reviews in an image file at https://purple.com/mattresses/compare. Unfortunately, the alternate text that accompanies this image file reads: "purple reviews on amazon." This



alternate text is meaningless to Plaintiff Gathers, and as a result, she too is blocked from performing the same research Purple affords consumers who do not suffer a visual disability.

37.     These barriers, and others, deny Plaintiffs full and equal access to all of the services the Website offers, and now deter them from attempting to use the Website. Still, Plaintiffs would like to, and intend to, attempt to access the Website in the future to research the products and services the Website offers, or to test the Website for compliance with the ADA.

38.     If the Website were accessible, *i.e.* if Purple removed the access barriers described above, Plaintiffs could independently research and purchase Purple's products.

39.     Though Purple may have centralized policies regarding the maintenance and operation of its Website, Purple has never had a plan or policy that is reasonably calculated to make its Website fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

40.     The law requires that Purple reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

41.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Purple's failure to provide its online content and services in a manner that is compatible with screen reader technology.

### PURPLE'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

42.     Purple has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

43.     Indeed, the Disability Rights Section of the DOJ reaffirmed in a 2015 Statement of Interest before the United States District Court for the District of Massachusetts that it has been a "longstanding position" of the Department of Justice "that the ADA applies to websites of public accommodations." *See National Association of the Deaf v. Massachusetts Institute of Technology*, No. 3:15-cv-300024-MGM, DOJ Statement of Interest in Opp. To Motion to Dismiss or Stay, Doc. 34, p. 4 (D. Mass. Jun. 25, 2015) ("MIT Statement of Interest"); *see also National Association of the Deaf. v. Harvard University*, No. 3:15-cv-30023-MGM, DOJ Statement of Interest of the United States of America, Doc. 33, p.4 (D. Mass. Jun. 25, 2015) ("Harvard Statement of Interest").

44.     In the event Purple were unaware of the DOJ's "longstanding position," counsel for Plaintiffs sent Purple's CEO, Sam Bernards, a letter on or about May 18, 2018, explaining that Purple's "website contains significant failures that block visually impaired individuals…who use screen-reader software from accessing its online content." [15]

45.     In the spirit of cooperation, Plaintiffs' May 18, 2018 letter identified various types of access barriers they encountered on Purple's Website, with examples.[16]

> Links on the websites do not describe their purpose. These links lack labels and as a result, blind users cannot determine whether they want to follow a particular link, making navigation an exercise in trial and error. For example, your websites contain icons in the upper right-hand corner that allow visitors to connect with your company through social media and to access resort reviews. However, these icons do not provide alternative text describing their purpose. As a result, our clients are not able to easily access these options.

---

[15]     The United States District Court for the Western District of Pennsylvania previously described these pre-litigation dispute resolution efforts as "the most expedient and cost-effective means of resolving" website accessibility claims. *Sipe v. Am. Casino & Ent. Properties, LLC*, 2016 WL 1580349, *3 (W.D. Pa. Apr. 20, 2016

[16]     Plaintiffs admit this letter includes a scrivener's error: "resort" should be replaced with "product."

46.    As a result of encountering these access barriers, and others, on Purple's Website, Plaintiffs requested that Purple accommodate their disability by making the Website compatible with screen-reader software.

47.    As a result of Plaintiffs' accommodation request, Purple changed its Website to include some of the alternate text Plaintiffs requested. For example, when Plaintiffs navigate to the Website's Facebook icon today, their screen readers read: "like us on Facebook link." As a result, Plaintiffs can now connect with Purple on social media, where they could not before contacting Purple's CEO on May 18, 2018.

48.    Unfortunately, also as a result of Plaintiffs' accommodation request, Purple sued Plaintiffs Suchenko and Gathers in the United States District Court for the District of Utah on July 9, 2018, bringing claims against them for (1) Declaratory Relief, (2) Negligent Misrepresentation, (3) Fraud, (4) Fraudulent Non-Disclosure, and (5) Civil Conspiracy. *See Purple Innovation, LLC v. Suchenko et al*, Case No. 2:18-cv-00543-DB (ECF 2) (the "Utah case").

49.    The bad faith in which Purple has sued Plaintiffs Suchenko and Gathers is clear from the misrepresentations included in Purple's Complaint against them. For example, the Complaint alleges:

(a)    "Purple does not have a brick and mortar location[.]" *See* Complaint, ¶ 20. Wrong, it does.

(b)    "Thereafter, the Defendants, through counsel, did send a letter to Purple demanding money." *Id*. ¶ 32. No they didn't. Plaintiffs, through counsel, requested Purple make them a reasonable accommodation: "Based on the foregoing, our clients demand that you immediately remediate your website so that it complies with the ADA, PHRA, and MPAA, and adopt a policy that protects against such discrimination, indefinitely."

(c)    "The Defendants further knew that the only purpose of their accessing Purple's website, if such every [sic] occurred, was to enable the Defendants to assert a claim against Purple for money." *Id.* ¶ 64. This is false and inconsistent with the complaints Plaintiffs Suchenko and Gathers have filed in the past, which seek a declaratory judgment, injunctive relief, fees, and costs—which relief is permitted under the ADA. Plaintiffs have never asserted a website accessibility claim against a public accommodation for money.

50.    To resist this coercive misconduct, pursuant to Federal Rule of Civil Procedure 11(c)(2), Counsel for Suchenko and Gathers served attorney Gregory F. Hurley and his law firm, Sheppard, Mullin, Richter, & Hampton LLP, a Motion for Rule 11 Sanctions on July 20, 2018.

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

51.    There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

52.    While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

53.    Plaintiffs allege violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

54.    Resolution of Plaintiffs' claims do not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Purple offers content and services on its Website, and (b) whether Plaintiffs can access the content and services.

## SUBSTANTIVE VIOLATIONS

### COUNT I

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

55.      The assertions contained in the previous paragraphs are incorporated by reference.

56.      Purple's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

57.      In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Purple does not provide Plaintiffs with full and equal access to its Website, it has violated the ADA.

58.      In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.; see also* MIT Statement of Interest, p. 4; Harvard Statement of Interest, p. 4.

59.      Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

60.      Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making

visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

61.    In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

62.    By failing to provide its Website's content and services in a manner that is compatible with auxiliary aids, Purple has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)    denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website;

(b)    affording individuals with visual disabilities access to its Website that is not equal to, or effective as, that afforded others;

(c)    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)    denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

63.     Purple has violated Title III by, without limitation, failing to make its Website's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

64.     Purple has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

65.     Making its online goods, content, and services compatible with screen reader programs does not change the content of Purple's Website or result in making the Website different, but rather enables individuals with visual disabilities to access the Website Purple already provides. *See* MIT Statement of Interest, p. 20; Harvard Statement of Interest, p. 20.

66.     Purple's ongoing and continuing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiffs and other individuals with visual disabilities.

67.     Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

68.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs request relief as set forth below.

## COUNT II

### 42  U.S.C. § 12203 Retaliation/Coercion

43      The assertions contained in the previous paragraphs are incorporated by reference.

44      Plaintiffs bring this specific retaliation claim against Purple, pursuant to the ADA's

prohibition against retaliation and coercion as set forth in 42 U.S.C. § 12203.

45      The ADA statutory retaliation/coercion proscription provides:

(a) Retaliation
No person shall discriminate against any individual because such individual has
opposed any act or practice made unlawful by this chapter or because such
individual made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation
It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual
in the exercise or enjoyment of, or on account of his or her having exercised or
enjoyed, or on account of his or her having aided or encouraged any other individual
in the exercise or enjoyment of, any right granted or protected by this chapter.

(c) Remedies and procedures
The remedies and procedures available under sections 12117, 12133, and 12188 of
this title shall be available to aggrieved persons for violations of subsections (a) and
(b), with respect to subchapter I, subchapter II and subchapter III, respectively.

46      Pursuant to a directive from Congress, the U.S. Department of Justice has

promulgated enforceable regulations regarding § 12203, as any such violation thereof pertains to

public accommodations pursuant to Title III of the ADA, 12281, *et seq.*

47      28 CFR § 36.206, Retaliation or Coercion, provides:

(a) No private or public entity shall discriminate against any individual because that
individual has opposed any act or practice made unlawful by this part, or because
that individual made a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing under the Act or this part.

(b) No private or public entity shall coerce, intimidate, threaten, or interfere with
any individual in the exercise or enjoyment of, or on account of his or her having

22

exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.

(c) Illustrations of conduct prohibited by this section include, but are not limited to:

> (1) Coercing an individual to deny or limit the benefits, services, or advantages to which he or she is entitled under the Act or this part;

> (2) Threatening, intimidating, or interfering with an individual with a disability who is seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation;

> (3) Intimidating or threatening any person because that person is assisting or encouraging an individual or group entitled to claim the rights granted or protected by the Act or this part to exercise those rights; or

> (4) Retaliating against any person because that person has participated in any investigation or action to enforce the Act or this part.

48      The plain unambiguous language of the Statutory and Regulatory frameworks prohibits discriminating against an individual because that individual engaged in his statutorily and Constitutionally protected conduct pursuant to this chapter of the ADA, 42 U.S.C. 12181, et seq., Title III of the ADA.

49      The plain unambiguous language of the Statutory and Regulatory frameworks prohibit coercing, intimidating, threatening, or interfering with any individual in the exercise and enjoyment of any right granted and protected by this chapter of the ADA, 42 U.S.C. 12181, et seq., Title III of the ADA.

50      As a remedial civil rights statute, the ADA is to be broadly construed to effectuate its purpose.

51      Purple is a public accommodation under the ADA and a public entity under 28 CFR § 36.206.

52      Plaintiffs engaged in protected conduct when they sent a letter to Purple on or about May 18, 2018 requesting it "immediately remediate [its] website so that it complies with the ADA, PHRA, and MPA, and adopt a policy that protects against such discrimination, indefinitely."

53      On July 9, 2018, less than two months after requesting Purple accommodate their disability by making its Website accessible to screen-readers, Purple sued Plaintiffs Suchenko and Gathers in the United States District Court for the District of Utah, alleging claims for (1) Declaratory Relief, (2) Negligent Misrepresentation, (3) Fraud, (4) Fraudulent Non-Disclosure, and (5) Civil Conspiracy.

54      Purple's retaliatory, coercive, threatening, and intimidating actions are *prima facie* evidence of its intent in responding to Plaintiffs' requests for accommodation. The method by which Purple chose to defend the prospective injunctive relief pursuant to the ADA was to coerce, intimidate, threaten, and interfere with Plaintiffs' right to access the goods, content, and services on Purple's Website, and to interfere with right to request such accommodations from other public accommodations in the future.

55      Purple's actions have made Plaintiffs Suchenko and Gathers fearful of continuing to exert their rights in this case and others pursuant to the ADA.

56      Plaintiffs Suchenko and Gathers have suffered and continue to suffer emotional distress, mental anguish, and dignitary harm as a result of Purple's actions set forth herein.

57      The purpose of Purple's Utah lawsuit is to coerce, intimidate, and threaten Plaintiffs Suchenko and Gathers and to retaliate against them for having sent Purple a letter on or about May 18, 2018 requesting a reasonable accommodation pursuant to the ADA. In other words, Purple sued Plaintiffs because Plaintiffs asked it to make its Website accessible to screen reader technology.

58    There is a clear, unambiguous, temporal connection between Plaintiffs' May 18, 2018 letter to Purple and Purple's federal lawsuit demanding they pay punitive and exemplary damages.

59    Purple's actions were done purposefully, and with the intent of intimidating, coercing, retaliating, and threatening Plaintiffs and others for bringing this and similar actions under Title III of the ADA.

60    Plaintiffs have a reasonable belief that Purple's discriminatory conduct will continue into the future. Further, as this type of discriminatory activity is easily capable of repetition, any attempt by Purple to cease the offending action will not moot this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(A)    A Declaratory Judgment that at the commencement of this action Purple was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Purple took no action that was reasonably calculated to ensure that its Website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Purple to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Purple has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with

the law—the specific injunctive relief requested by Plaintiffs are described more fully in paragraph 11 above.

(C)    A permanent injunction enjoining Purple from continuing its retaliatory and coercive conduct;

(D)    Payment of actual, statutory, and punitive damages;

(E)    Payment of costs of suit;

(F)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same); and

(G)    The provision of whatever other relief the Court deems just, equitable and appropriate.

(H)    An Order retaining jurisdiction over this case until Purple has complied with the Court's Orders.

Dated: July 23, 2018                    Respectfully Submitted,

                                        */s/ Benjamin J. Sweet*
                                        Benjamin J. Sweet
                                        bsweet@carlsonlynch.com
                                        Kevin W. Tucker
                                        ktucker@carlsonlynch.com
                                        **CARLSON LYNCH SWEET KILPELA**

**& CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322.9243

*Counsel for Plaintiffs*